**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

TOWN OF OGDEN DUNES, et al.,

    Plaintiffs,

    v.

UNITED STATES OF AMERICA
DEPARTMENT OF INTERIOR; DAVID
BERNHART, in his official capacity as
Secretary of the Department of Interior;
NATIONAL PARK SERVICE; DAVID
VELA, in his official capacity as Acting
Director of the National Park Service; PAUL
LABOVITZ, Park Superintendent, Indiana
Dunes National Park, in his official capacity;
UNITED STATES ARMY CORPS OF
ENGINEERS; LIEUTENANT GENERAL
TODD T. SEMONITE, Commanding
General of the U.S. Army Corps of
Engineers, in his official capacity,

    Defendants.

CAUSE NO.: 2:20-CV-34-TLS-JEM

**OPINION AND ORDER**

   The Town of Ogden Dunes, Indiana, sits at the south shore of Lake Michigan. After

decades of beach erosion, the waters of Lake Michigan have reached the Town's shoreline

protection system, which is comprised of sheet piling, stone toe, and revetment. The Town has

unsuccessfully sought permits from the Army Corps of Engineers (Corps) and the National Park

Service (NPS) to reinforce this system. Concerned by the rising waters and the alleged imminent

failure of the shoreline protection system, the Plaintiffs filed this lawsuit, seeking declaratory and

injunctive relief to prevent imminent and permanent harm to their shoreline along Lake

Michigan. Under the Administrative Procedures Act, the Plaintiffs challenge the Defendants'

authority to regulate the proposed reinforcement of the shoreline protection system, allege that

the Defendants' actions have been arbitrary and capricious, and ask the Court to require the

Corps to make a decision on the Town's permit application. Since the lawsuit was filed, the

Plaintiffs, by stipulation of the parties, were granted emergency permits to perform the first stage

of work to reinforce the shoreline protection system, and the Court has held regular status

conferences with the parties regarding the emergency work. This matter is now before the Court

on the Defendants' fully briefed Motion to Dismiss [ECF No. 45], which the Court grants in part

and denies in part.

## PROCEDURAL AND FACTUAL BACKGROUND

The following facts are taken from the Amended Complaint, the documents referenced in

the Amended Complaint, and relevant statutes.[1]

### A.     Establishment of the Indiana Dunes National Park

In 1966, Congress established the Indiana Dunes National Lakeshore (Lakeshore). Pub.

L. No. 89-761, 80 Stat. 1309 (1966). In 1976, Congress expanded the Lakeshore's boundaries

with a new boundary map titled "Boundary Map, Indiana Dunes National Lakeshore," dated

September 1976, and bearing the number "626–91007." Pub. L. No. 94-549, 90 Stat. 2529

(1976); 16 U.S.C. § 460u (1976).[2] The Senate Report describes the effect of the new 1976

Boundary Map as "revis[ing] the boundaries of the Lakeshore from 8,329.8 acres to 11,231.8

---

[1] In reviewing a motion to dismiss, a court may consider "the complaint itself" and "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)). Thus, the three exhibits attached to the Defendants' motion are properly considered on the instant motion.

[2] The original boundary map was dated September 1966 and numbered LNPNE-1008-ID. *See* Pub. L. No. 89-761, 80 Stat. 1309 (1966); 16 U.S.C. § 460(u) (1970). Newer boundary maps were issued in 1980, *see* Pub. L. No. 96-612, 94 Stat. 3575 (1980) (number 626–91014); 16 U.S.C. § 460(u) (1982); in 1986, *see* Pub. L. No. 99-583, 100 Stat. 3318 (1986) (number 626–80,033–B); 16 U.S.C. § 406(u) (1988); and in 1992, *see* Pub. L. No. 102-430, 106 Stat. 2208 (number 626–80,039–C); 16 U.S.C. § 460u (1993). The parties do not argue that the amendments change any of the boundaries relevant to the instant motion.

acres, including in the new boundary 2,766.08 acres of additional land and *542 acres of submerged land and water area extending 300 feet into Lake Michigan.*" S. Rep. 94-1189, at 6 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5629, 5630 (emphasis added).

In compliance with the 1976 statute, the Secretary of the Interior published a "detailed description [of] the boundaries of Indiana Dunes National Lakeshore" in the Federal Register titled "Indiana Dunes National Lakeshore, Boundary Description." 43 Fed. Reg. 2240, 2240–03 (Jan. 16, 1978); *see* 16 U.S.C. § 460u-2 (1976). Two portions of the 1976 Boundary Description of "Parcel 3" are relevant to the instant motion. *See* Boundary Description, 43 Fed. Reg. at 2243.

The Defendants cite the portion identifying the northern boundary of the Lakeshore north of Ogden Dunes:

> . . . said west line being the county line between Lake County and Porter County, Ind.; thence north along said west line to the northwest corner of said Section 34; thence continuing north along the west line of Section 27, Township 37 North, Range 7 West, Second Principal Meridian and along said west line prolonged northward to a point in Lake Michigan, *said point being 300 feet north of the south shore of Lake Michigan; thence easterly parallel to and 300 feet north of the south shore of Lake Michigan to a point 3,600 feet west of the east line of Section 25, Township 37 North, Range 7 West, Second Principal Meridian*; thence southerly to the point where the south shore of Lake Michigan meets the west edge of Burns Waterway; thence continuing southerly along said west edge of Burns Waterway to the south line of said Section 25; thence westerly along said south line to the point of beginning; . . . .

*Id.* (emphasis added).

The Plaintiffs cite the language immediately following, which "excepts" from the Lakeshore's boundaries "an area within the corporate limits of Ogden Dunes." *Id*. The exception describes those corporate limits, including the Town's northern boundary:

> thence northerly along said west line of said lane and along the west line of Parcel B in said subdivision and along the west line of an alley that is platted West of Lot 239 in said Ogden Dunes Third Subdivision to a point, said point being the intersection of the last described line and the north line of said Lot 239 extended southwesterly; *thence northeasterly along a line, said line described as being 150*

*feet northwesterly of and parallel to the north edge of Shore Drive in Ogden Dunes*, to the east line of Section 26, Township 37 North, Range 7 West, Second Principal Meridian; thence south along said east line to the point of beginning.

*Id*. (emphasis added).

Both the 1976 and 1992 Boundary Maps of the Lakeshore demarcate the corporate limits of Ogden Dunes as well as the northern boundary of the Lakeshore 300 feet north of the shoreline in Lake Michigan. *See* Defs.' Ex. 1, ECF No. 46-1; Defs.' Reply Exs. 1, 2, ECF Nos. 64-1, 64-2. In 2019, the Lakeshore became the Indiana Dunes National Park (Park). *See* Pub. L. No. 116-6, § 115(a)(1), 133 Stat. 13, 232 (2019).

**B.    The Ogden Dunes Lakefront**

The Town of Ogden Dunes is effectively surrounded by the Park. The Town owns approximately 4,630 feet of lake frontage on Lake Michigan. Am. Compl. ¶ 28, ECF No. 57. A shore protection system (sheet piling, stone toe, and revetment) installed in the 1980s and 1990s, with riparian rights, protects the Town infrastructure, including Town-owned dunes, beach access ways, roads, utilities, and private homes. *Id.* at ¶¶ 1, 28. The Ogden Dunes shoreline has completely eroded to the extent that the steel wall and stone protection are now totally exposed to Lake Michigan. *Id.* at ¶ 1.

The primary cause of the erosion is the presence of four man-made structures to the east built in the 1960s, 1970s, and 1980s that extend into Lake Michigan, disrupting the littoral drift of sand and sediment westerly that previously replenished the Ogden Dunes shoreline with approximately 194,000 cubic yards of sand annually. *Id.* at ¶¶ 1, 30–33. In 1984, the Corps entered a consent decree to secure funding for beach nourishment mitigation related to the Burns Small Boat Harbor when the sand previously placed by the Corps had eroded. *Id*. at ¶ 37. A February 2017 study by the Corps confirmed that, dating back to the 1960s, the "Burns

Waterway Harbor in Portage [has] disrupted sediment littoral flow from Michigan shorelines to . . . the Ogden Dunes Beach." *Id*. at ¶ 38.

**C.      Construction of the Town's Shoreline Protection System**

In 1984 through 1986, the Town consulted with the Corps and the Indiana Department of Natural Resources (IDNR) to develop a Shore Protection Policy that included designs for sheet piling, stone toe, and revetment; the plan was approved on February 2, 1987. *Id.* at ¶ 39. The shore protection system was installed above the ordinary high-water mark (OHWM). *Id*. From 1984 through 1986, sheet piling that measured approximately 14 to 25 feet in height was placed 19 to 25 feet north of private property, on Town property, along the shoreline in the dunes for approximately 2,415 of the 4,700 linear feet of Ogden Dunes that borders Lake Michigan. *Id*. at ¶ 40. Stone toe protection was placed on approximately 440 linear feet of the sheet piling. *Id*. From 1994 to 1998, additional sheet piling was placed 19 to 25 feet north of private property, on Town property, along the shoreline and above the OHWM, covering approximately 1,405 of the 4,700 linear feet of Ogden Dunes that borders Lake Michigan. *Id*. at ¶ 41. Stone toe protection was placed on approximately 1175 linear feet of the sheet piling. *Id*. In 1998, stone revetment was placed 25 feet north of private property, on Town property, along the shoreline, covering approximately 715 of the 4,700 linear feet of Ogden Dunes that borders Lake Michigan.

To address the sand starvation of the Ogden Dunes shoreline, the Corps issued a permit to the State of Indiana in 1997 to install a steel wall of sheet piling north of 2 through 16 Shore Drive, below the OHWM. *Id.* at ¶ 42. The NPS joined in support of the restoration of this failed system and requested the use of stone toe protection. *Id*.

**D.     Erosion at the Ogden Dunes Shoreline**

In 2000, according to a consent decree, the Corps placed 143,000 cubic yards of sand on the Portage Lakefront Beach in the Park. *Id*. at ¶ 44. This sand mobilized into the littoral flow and provided an ample beach north of Ogden Dunes for many years. *Id*. However, the Corps subsequently failed to comply with the consent decree, causing the Ogden Dunes beach to suffer from sand starvation again. *Id*. By 2009, the east end of Ogden Dunes was exposed. *Id*.

The dune and beach north of Ogden Dunes has eroded such that the only protection left from the waters of Lake Michigan is the metal sheet piling installed in the 1980s and 1990s located on Town property. *Id*. at ¶¶ 1, 36, 43. At least one section of the sheet piling has experienced a partial and continuing failure and, at that time the Complaint was filed, was in imminent danger of complete failure. *Id*. at ¶¶ 2, 45. If any portion of the sheet piling and stone protection fails, the Town's infrastructure, including town-owned dunes, beach access ways, roads, utilities, and more than 60 private homes are in danger of destruction. *Id.* at ¶¶ 2, 46. This could, in turn, lead to the release of sewage and other pollutants into Lake Michigan, endangering the public and wildlife as well as the lives of the occupants of the residences. *Id*. at ¶ 46. The Town declared a state of emergency with respect to its shoreline. *Id*. at ¶¶ 2, 62.

In December 2017, despite objecting to the placement of stone to protect the Ogden Dunes shoreline, the NPS allowed the placement of stone protection at the Park's Portage Lakefront on the dunes and onto the beach adjacent to the pavilion. *Id*. at ¶ 59. And, in 2019, the Corps started a two-year project to maintain the federal breakwater at Burns Harbor by placing additional stone on the existing structure; an Environmental Impact Statement (EIS) was not required. *Id.* at ¶ 60.

6

**E.      Maintenance and Improvement of the Town's Shoreline Protection System**

For a number of years, the Town has sought permits or approvals to perform preventative maintenance to protect the steel wall and to prevent further erosion. *Id.* at ¶¶ 3, 47. The IDNR and the Indiana Department of Environmental Management (IDEM) have issued the required Indiana state permits. *Id.* at ¶¶ 3, 47.

On October 1, 2009, the Town submitted an application for this work to the Corps. *Id.* at ¶ 48. At that time, the majority of the steel wall was covered by a sand dune. *Id.* The February 8, 2010 Corps public notice for the permit application stated that an EIS was not needed and that the Corps had determined the activity would not affect any federally endangered or threatened species and was not likely to adversely affect any historic property. *Id.* at ¶ 49. Since 2009, the NPS has written IDNR, IDEM, and the Corps multiple times to prevent the Town from obtaining permits and approvals necessary to do the work on the steel wall and shoreline. *Id.* at ¶ 50.

On December 17, 2014, the Town again sought approval from the IDNR, the IDEM, the Corps, and the NPS to place stone toe protection along lots 4 through 156 Shore Drive in Ogden Dunes. *Id.* at ¶ 51. IDNR and IDEM granted the required state permits. *Id.* In a January 9, 2016 letter to the Corps, the NPS objected to the permit. *Id.* at ¶ 52. On May 11, 2016, the Corps stated that it would not issue a permit based on the NPS' objections. *Id.* at ¶ 53. On June 15, 2017, the Corps emailed the Town, stating that the NPS will only approve beach nourishment and not hard armoring techniques as proposed in the permit request. *Id.* at ¶ 54.

On June 10, 2019, the Town submitted a new request to the NPS seeking approval for the placement of stone toe protection for the Town shoreline. *Id.* at ¶ 55. In a July 18, 2019 letter to the Town, the NPS denied the Town's request for a Special Use Permit. *Id.* at ¶ 56; Defs.' Ex. 2,

1, ECF No. 46-2.[3] In the letter, the NPS reiterated its prior comments that the project is within

Park boundaries and that environmental compliance under the National Environmental Policy

Act (NEPA) is required. Defs.' Ex. 2, 1. The letter recommended, among other things, that the

Town prepare an EIS for the project and request a new Special Use Permit once the necessary

information is gathered. *Id*. at 2, 4.

On September 26, 2019, the Corps sent a letter to the Town with the subject "Information

requirements for the Town of Ogden Dunes Shoreline Protection Along Lake Michigan" asking

the Town to provide six items of information "to complete [its] review of [the Town's] project

under an Individual Permit," one of which was a "Special Use Permit" from the NPS. Defs.' Ex.

3, ECF No. 46-3; *see* Am. Compl. ¶ 57. The Plaintiffs allege that the area of proposed work at

the steel wall is not on, nor will it affect, NPS property. *Id.* at ¶ 58.

**F.     This Lawsuit and the Issuance of an Emergency Permit in 2020**

On January 24, 2020, four months after the Corps' letter, the Plaintiffs filed their

Complaint [ECF No. 1]. On July 29, 2020, the Plaintiffs filed an Amended Complaint [ECF No.

57] solely to add two named plaintiffs.

In Count I, the Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201 that

neither the Corps nor the NPS has authority to prevent the Town from conducting the proposed

maintenance and repair work. Am. Compl. ¶ 69.A. In the alternative, the Plaintiffs seek a

declaration that the Corps and the NPS failed to comply with the Administrative Procedures Act

(APA) by (1) failing to grant or deny the issuance of a permit for the project; (2) imposing

---

[3] The Amended Complaint alleges that the NPS "has neither granted nor denied Ogden Dunes'
application, but has rendered indeterminate conditions and stipulations beyond its jurisdiction and
authority, including requiring an EIS at Ogden Dunes' expense." Am. Compl. ¶ 56. However, the
Defendants have submitted the July 18, 2019 letter from the NPS to which the Plaintiffs allude in
paragraph 56, and the letter states that the NPS "is once again, not issuing a permit for the activities
described in your most recent Special Use Permit request." Defs.' Ex. 2, 1.

conditions beyond their statutory authority; (3) unreasonably extending the process for the issuance of the permit; (4) imposing indefinite, arbitrary, and capricious conditions on the Town; and (5) granting conditional relief, but then requiring complete remediation of that relief, which is beyond their statutory authority. Am. Compl. ¶ 69.B. The Plaintiffs also seek various other forms of declaratory relief discussed in the Analysis below. Am. Compl. ¶¶ 69.C–F.

Count II alleges that the Defendants have violated the APA by acting contrary to their legal obligations, unlawfully withholding and unreasonably delaying agency action, acting in excess of their statutory authority, and violating the Plaintiffs' rights under the Fifth Amendment to the United States Constitution. *Id.* at ¶¶ 70–73. Count III seeks a Writ of Mandamus pursuant to 28 U.S.C. § 1651. *Id*. at ¶ 74. Count IV seeks (1) preliminary and permanent injunctive relief prohibiting the Defendants from exercising authority over and otherwise interfering with the maintenance and repair of the shore protection system and (2) an order requiring the Corps to perform its statutory duties in funding and renourishing the sand along and adjacent to the Ogden Dunes shoreline. *Id.* at ¶¶ 75–76. Finally, Count V brings a claim to quiet title to the land immediately north of the Town of Ogden Dunes. *Id.* at ¶ 78.

On March 12, 2020, the Plaintiffs filed a Motion for Preliminary Injunction [ECF No. 11]. In March and May 2020, the Corps and the NPS issued emergency permits for certain work by the Town along the shoreline. *See* Stipulation, ECF No. 30; Stipulation, ECF No. 60. On May 26, 2020, the Defendants filed the instant Motion to Dismiss [ECF No. 45]. On August 20, 2020, the parties resolved the Motion for Preliminary Injunction by Stipulation. ECF Nos. 60–62.

Since early in the case, the Court has held regular status conferences with the parties, who continue to cooperate to resolve issues related to the work being done along the shoreline pursuant to the emergency permits. *See* ECF Nos. 61, 65–68, 71, 74, 78, 79, 81, 84, 85, 86.

9

## LEGAL STANDARDS

A party may bring a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). *See Apex Dig., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009); Fed. R. Civ. P. 12(b)(1). In considering such a motion, the "district court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007) (quoting *Long v. Shorebank Dev. Corp*., 182 F.3d 548, 554 (7th Cir. 1999)). In addition, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (quoting *Long*, 182 F.3d at 554).

A motion to dismiss brought under Rule 12(b)(6) "challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). The Court presumes that all well-pleaded allegations are true, views these well-pleaded allegations in the light most favorable to the plaintiff, and draws all reasonable inferences in favor of the plaintiff. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010). Surviving a Rule 12(b)(6) motion "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

## ANALYSIS

The Court considers the Defendants' motion to dismiss each of the counts of the Amended Complaint and follows the parties' briefing structure.

## I.      Count I—Declaratory Judgment

In Count I, the Plaintiffs seek declaratory relief on six subcounts pursuant to the Declaratory Judgment Act (DJA), 28 U.S.C. § 2201. Am Compl. ¶¶ 69.A–F. The DJA authorizes federal courts to "declare the rights and other legal relations of any interested party seeking such declaration." *Id.* § 2201(a). However, the DJA does not provide an independent source of subject matter jurisdiction or an independent cause of action. *Manley v. Law*, 889 F.3d 885, 893 (7th Cir. 2018) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)); *GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 619 (7th Cir. 1995). The Court considers each subcount in turn.

## A.      The Regulatory Authority of the Corps and the NPS

In Count I.A, the Plaintiffs seek a declaratory judgment that the Corps and the NPS have no regulatory authority over the Plaintiffs' proposed maintenance and repair of the shore protection system because the location lies "beyond the natural OHWM and thus beyond the Defendants['] jurisdiction." Am. Compl. ¶ 69.A.

## 1.      The Corps' Regulatory Authority Under the Clean Water Act

The objective of the Clean Water Act (CWA) "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Toward this goal, § 404 of the CWA authorizes the Corps to regulate the discharge of dredged or fill material into "navigable waters" through the issuance of permits. *See id.* § 1344(a) ("The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill

11

material into the navigable waters at specified disposal sites."); *see also id.* §§ 1311(a), 1362(6),

1362(12)(A); *Rapanos v. United States*, 547 U.S. 715, 722–23 (2006).

The CWA defines "navigable waters" as "the waters of the United States, including the

territorial seas." 33 U.S.C. § 1362(7). The regulations provide: "The term waters of the United

States and all other terms relating to the geographic scope of jurisdiction are defined at 33 C.F.R.

part 328." 33 C.F.R. § 323.2(a). Therein, the term "waters of the United States" is defined as:

> (1) The territorial seas, and waters which are currently used, or were used in the
>     past, or may be susceptible to use in interstate or foreign commerce, including
>     waters which are subject to the ebb and flow of the tide;
> (2) Tributaries;
> (3) Lakes and ponds, and impoundments of jurisdictional waters; and
> (4) Adjacent wetlands.

*Id.* § 328.3(a).[4] Thus, the Defendants argue that Lake Michigan, a plainly navigable body of

water, is unquestionably among "the waters of the United States" and subject to the Corps'

regulatory authority. *See Rapanos*, 547 U.S. at 730–39 (addressing the extent to which the

Corps' authority under the CWA extends beyond "traditional navigable waters"); *City of

Milwaukee v. Illinois*, 451 U.S. 304, 317–18 (1981) (holding that the CWA replaced the prior

federal common law regarding the regulation of water pollution, in a case addressing discharges

into Lake Michigan).

The Plaintiffs do not dispute this authority or that Lake Michigan is a "waters of the

United States." Rather, the Plaintiffs' position is that the current OHWM is artificially created

such that the Corps does not have jurisdiction over the area of the Plaintiffs' proposed work. *See*

---

[4] The current version of 33 C.F.R. § 328.3(a) became effective June 22, 2020. *See* The Navigable Waters
Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (Apr. 21, 2020). No
party argues that the changes from the prior versions in 2015 and 2019 materially affect the issue of Lake
Michigan as "waters of the United States" on the instant motion. *See* Clean Water Rule: Definition of
"Waters of the United States," 80 Fed. Reg. 37,054 (June 29, 2015) (effective Aug. 28, 2015); Definition
of "Waters of the United States"—Recodification of Pre-Existing Rules, 84 Fed. Reg. 56,626 (Oct. 22,
2019) (effective Dec. 23, 2019).

Am. Compl. ¶¶ 30, 35–36, 42, 67–69. The Plaintiffs argue that, if the fact finder determines that the OHWM is somewhere other than the current artificially created high-water mark at the steel wall, the Corps lacks jurisdiction over the Plaintiffs' proposed work.

In reply, the Defendants correctly note that § 404 of the CWA does not reference the OHWM in relation to the Corps' authority to issue permits for the type of work proposed by the Plaintiffs on a navigable body of water such as Lake Michigan. However, neither party discusses 33 C.F.R. § 328.4, which sets out the limits of the Corps' jurisdiction. For "[n]on-tidal waters of the United States[,] . . . [i]n the absence of adjacent wetlands, the jurisdiction extends to the [OHWM]." 33 C.F.R. § 328.4(c)(1);[5] *see, e.g.*, *United States v. Marion L. Kincaid Tr.*, 463 F. Supp. 2d 680, 693–94 (E.D. Mich. 2006) (discussing the application of the OHWM to non-tidal waters under the CWA and the Rivers and Harbors Act (RHA) in relation to Lake Huron). The regulations define the OHWM as the "line on the shore established by the fluctuations of water and indicated by physical characteristics . . . or other appropriate means that consider the characteristics of the surrounding areas." *Id.* § 328.3(c)(7). The parties also do not discuss 33 C.F.R. § 328.5, which addresses the effect of permanent changes to the shoreline on the Corps' regulatory jurisdiction:

> Permanent changes of the shoreline configuration result in similar alterations of the boundaries of waters of the United States. Gradual changes which are due to natural causes and are perceptible only over some period of time constitute changes in the bed of a waterway which also change the boundaries of the waters of the United States. For example, changing sea levels or subsidence of land may cause some areas to become waters of the United States while siltation or a change in drainage may remove an area from waters of the United States. Man-made changes may affect the limits of waters of the United States; however, permanent changes should not be presumed until the particular circumstances have been examined and verified by the district engineer. Verification of changes to the lateral limits of jurisdiction may be obtained from the district engineer.

---

[5] If "adjacent wetlands are present, the jurisdiction extends beyond the [OHWM] to the limit of the adjacent wetlands." 33 C.F.R. § 328.4(c).

13

*Id.* § 328.5.

The Plaintiffs have alleged facts showing that the current OHWM is at the shore protection system. Am. Compl. ¶ 43 ("Currently the majority of the shoreline of Ogden Dunes along Lake Michigan has completely eroded to the extent that the sheet piling or stone protection is totally and unnaturally exposed to the waters of Lake Michigan."). However, the Plaintiffs have also alleged that the current OHWM is the result of man-made changes to the east that have starved the Ogden Dunes beach of sand over decades. There is no information before the Court regarding a determination by the district engineer.[6] Based on the Plaintiffs' allegations and the legal arguments presented, the Court denies the motion to dismiss Count I.A as to the Corps.

2.      *NPS' Regulatory Authority Based on the Parks' Boundaries*

The regulations provide, in relevant part, that the NPS has regulatory authority over:

> (3) Waters subject to the jurisdiction of the United States *located within the boundaries of the National Park System*, including navigable waters and areas within their ordinary reach (up to the mean high water line in places subject to the ebb and flow of the tide and up to the ordinary high water mark in other places) and, except in Alaska, without regard to the ownership of submerged lands, tidelands, or lowlands; . . . .

36 C.F.R. § 1.2(a)(3) (emphasis added); *see also* 54 U.S.C. § 100751(b) (providing the Secretary of the Interior with authority to regulate "activities on or relating to water *located within System units*, including water subject to the jurisdiction of the United States").

The Amended Complaint alleges that the NPS is in "violation of the APA . . . by exercising authority over, and/or in unreasonably delaying approval of Plaintiff's[] shore protection plans and work upon property which lies *beyond the boundaries of NPS and the authority of NPS*," Am. Compl. ¶ 25 (emphasis added), and that "[n]one of the work proposed by

---

[6] In their reply brief, the Defendants reference a document containing the Corps' current jurisdiction determination under the CWA for Lake Michigan. *See* Defs.' Reply 3 n.3, ECF No. 64. However, the internet link to the document is not currently available.

Ogden Dunes is upon, across, over, through or under any park area," *id.* at ¶ 19. Thus, the

Plaintiffs allege that the NPS does not have jurisdiction over the area of proposed work. *Id.* at

¶ 69.A. The Defendants seek dismissal of the claim, arguing that the area of proposed work is

within Park boundaries. The Court finds that a factual and legal dispute regarding the boundaries

of the Park precludes dismissal on the instant motion.[7]

As set forth in more detail in the Background above, in 1976, Congress "revis[ed] the

boundaries of the [Park] . . . , including in the new boundary . . . 542 acres of submerged land

and water area extending 300 feet into Lake Michigan." S. Rep. 94-1189, at 6. The expanded

boundaries were established by the Boundary Map, dated 1976 and bearing number 626-91007,

adopted by Congress. *See* Pub. L. No. 94-549, 90 Stat. 2529 (1976); 16 U.S.C. § 460u (1976). In

compliance with the statute, the Secretary of the Interior published a "detailed description of the

boundaries of Indiana Dunes National Lakeshore" in the Federal Register, titled "Indiana Dunes

National Lakeshore, Boundary Description." 43 Fed. Reg. 2240–43; *see* 16 U.S.C. § 460u-2

(1976). "Parcel 3" defines the north boundary of the Park north of Ogden Dunes as

> along said west line prolonged northward to a point in Lake Michigan, said point
> being 300 feet north of the south shore of Lake Michigan; *thence easterly parallel*
> *to and 300 feet north of the south shore of Lake Michigan* to a point 3,600 feet west
> of the east line of Section 25. Township 37 North. Range 7 West, Second Principal
> Meridian.

Boundary Description, 43 Fed. Reg. at 2243 (emphasis added). In their motion, the Defendants

cite the Senate Report and this Boundary Description, noting that the northern boundary of the

---

[7] The Defendants are correct that the Supreme Court and numerous courts of appeals have affirmed that the NPS' regulatory authority reaches land and water within the boundary of a park unit regardless of ownership of the land. *See Sturgeon v. Frost*, 139 S. Ct. 1066, 1076 (2019) (citing 54 U.S.C. §§ 100751, 100501, 100102; 36 C.F.R. § 1.2(a)(3)); *High Point, LLLP v. Nat'l Park Serv.*, 850 F.3d 1185, 1189–91, 1198–1200 (11th Cir. 2017)); *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 630 F.3d 431, 442 (5th Cir. 2011); *United States v. Stephenson*, 29 F.3d 162, 164 (4th Cir. 1994); *Free Enter. Canoe Renters Ass'n of Mo. v. Watt*, 711 F.2d 852, 856 (8th Cir. 1983). However, that is not the issue on the instant motion.

Park is defined by reference to the south shore of Lake Michigan. Thus, the Defendants reason that, because Lake Michigan's shoreline now sits at the Town's shore protection system, the area of proposed work is within the Park's boundaries.

However, as countered by the Plaintiffs, the next sentence of same detailed description of Parcel 3 specifically "excepts" from the Park's boundaries "an area within the corporate limits of Ogden Dunes" and provides a detailed description of those corporate limits. *See id.* The north boundary of the Town's corporate limits is a fixed "line described as being 150 feet northwesterly of and parallel to the north edge of Shore Drive in Ogden Dunes." *Id*. The Defendants' opening brief does not acknowledge this exception to the Park's boundaries. Importantly, the Amended Complaint alleges that the shore protection system is on Town property. *Id.* at ¶¶ 40, 41.[8] Therein lies the conflict.

In their opening brief, the Defendants reason that the 1976 Boundary Description tying the northern boundary of the Park to Lake Michigan's shoreline "conforms to the venerable legal principle that a boundary described by a navigable waterway is ambulatory and moves with gradual changes in the location of the waterbody through processes such as erosion as accretion." Defs.' Br. 22–23, ECF No. 46. The cases cited by the Defendants in support address a property owner's boundary that is defined by the edge of a waterbody, whether a river or Lake Michigan. *See California ex. rel. State Lands Comm'n v. United States*, 805 F.2d 857, 864 (9th Cir. 1986) ("The federal law makes no exception for relictions or accretions resulting from artificial causes."); *Nebraska v. Iowa*, 143 U.S. 359, 360–61 (1892) (addressing boundaries defined by running water, whether private or between states and nations, and recognizing that "[a]ccretion, no matter to which side it adds ground, leaves the boundary still the center of the channel" and

---

[8] The Plaintiffs also allege that the proposed shore protection work is to take place on land that is owned by Ogden Dunes and/or the State of Indiana. Am. Compl. ¶ 27.

16

"[a]vulsion has no effect on boundary, but leaves it in the center of the old channel"); *Banks v. Ogden*, 69 U.S. 57, 67 (1864) (recognizing, in a case addressing private property bounded by Lake Michigan, that the owner of land bounded by a river, lake, or sea is entitled to additions made to the land). In the instant case, while the 300 feet within the Parks' north boundary is defined by the shoreline of Lake Michigan, the exception to the Park's boundaries for the corporate limits of the Town of Ogden Dunes is not. Based on the 1976 Boundary Map and the Boundary Description, the north limit of the Town of Ogden Dunes is defined by a fixed boundary measured north 150 feet from Shore Drive.

For the first time in their reply brief, the Defendants acknowledge that the corporate limits of the Town of Ogden Dunes are excepted from the Park's boundaries by statute but argue that "Congress' intent that the NPS be authorized to regulate the first 300 feet of Lake Michigan north of the shoreline takes precedence over the Park Service's legal description of the boundaries of the Park." Defs.' Reply 19, ECF No. 64 (citing *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984))). As the issue of Chevron deference is not fully briefed, the Court declines to rule on this basis on the instant motion. Accordingly, the Court denies the motion to dismiss Count I.A as to the NPS.

**B.     Administrative Procedures Act**

If the Corps and/or the NPS has authority over the Plaintiffs' proposed repairs, the Plaintiffs seek a declaratory judgment in Count I.B that the Corps and/or the NPS have failed to comply with the APA. Am. Compl. ¶ 69.B. As these claims are functionally identical to the claims alleged in Count II, the Court addresses these claims in Part II below.

17

### C.     Ordinary High Water Mark

In Count I.C, the Plaintiffs seek a declaratory judgment that "[t]he existing high-water mark is the result of artificially created conditions, created by parties other than Plaintiffs." Am. Compl. ¶ 69.C. The Defendants argue that the Court lacks jurisdiction over this claim because the Plaintiffs have not identified a statute providing a private right of action allowing for declaratory relief. However, the Plaintiffs have challenged the Corps' and the NPS' federal regulatory authority over the location of the proposed work. To the extent a determination related to the OHWM is relevant to a ruling on that challenge, the Court has jurisdiction over this claim. *Cf. Rapanos*, 547 U.S. at 725 (discussing the Corps' earlier regulatory extension of the definition of "the waters of the United States" "to include 'ephemeral streams' and 'drainage ditches' as 'tributaries' that are part of the 'waters of the United States,' provided that they have a perceptible 'ordinary high water mark' as defined in" the regulations (citations omitted)). The Court denies the motion as to Count I.C.

### D.     Quiet Title—NPS

In Count I.D, the Plaintiffs seek a declaratory judgment that the "NPS has no right, title, or interest in certain real estate that was not acquired by it through purchase or donation, and importantly, any land below the OHWM lakeward of the land owned by Ogden Dunes." Am. Compl. ¶ 69.D. As this claim is functionally identical to the claim under the Quiet Title Act alleged in Count V, the Court addresses the claim in Part IV below.

### E.     NEPA Environmental Impact Statement/Environmental Assessment

The Amended Complaint alleges that the Corps and the NPS are governed, in part, by the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331, and that the Defendants violated NEPA by requiring an Environmental Impact Statement (EIS) and requiring the Plaintiffs to fund

the cost of an EIS. Am. Compl. ¶ 20. In Count I.E, the Plaintiffs seek a declaratory judgment that "[t]he work contemplated by Plaintiffs is categorically excluded from an EIS or Environment Assessment under NEPA." Am. Compl. ¶ 69.E.[9]

The Defendants argue that the Court lacks jurisdiction to hear the claim because NEPA does not provide a private right of action and the Plaintiffs have failed to identify a final agency action in which a Defendant allegedly required either an EIS or an Environmental Assessment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990); *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 609 F.3d 897, 900 (7th Cir. 2010) ("Review of agency action under NEPA is governed by the [APA] and is limited to determining whether an agency action is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" (quoting 5 U.S.C. § 706(2)(A))); *see infra* Part II (discussing the final agency action requirement for an APA claim). However, in Counts I.B and II, the Plaintiffs bring claims under APA § 706(2)(A) against both the Corps and the NPS, including a challenge to the requirement of an EIS or EA. As addressed in Part II below, the Plaintiffs have not alleged a final agency action by the Corps but have alleged a final agency action by the NPS. Thus, the Court grants the motion as to Count I.E against the Corps on this basis.

The Defendants also argue that the Plaintiffs have failed to state a claim because they do not identify the specific categorical exclusion from an EIS or EA under NEPA that applies to their proposed reinforcement of the shore protection system. In their response brief, the Plaintiffs assert generally that they "have delineated with sufficient clarity that a categorical exclusion

---

[9] "Categorical exclusion means a category of actions that the agency has determined, in its agency NEPA procedures (§ 1507.3 of this chapter), normally do not have a significant effect on the human environment." 40 C.F.R. § 1508.1(d); *see also* 40 C.F.R. § 1501.4; Categorical Exclusions, NEPA.gov, https://ceq.doe.gov/nepa-practice/categorical-exclusions.html (last visited Mar. 1, 2022) (providing a list of categorial exclusions by agency as of June 18, 2020).

applied" but do not identify any facts in support. Pls.' Resp. 6, ECF No. 58. Because this is a bare legal conclusion, the Court grants the motion to dismiss Count I.E against the NPS for failure to state a claim.

**F.     Statutory Violations**

In Count I.F, the Plaintiffs seek a declaratory judgment that "[t]he Defendants are in violation of and have failed to comply with 33 U.S.C. §426e, 16 U.S.C. §1451, 16 U.S.C. §460(u)-11, and various other statutes, regulations, and orders." Am. Compl. ¶ 69.F.

*1.     33 U.S.C. § 426e*

It is a policy of the United States to promote shore protection projects, including beach restoration and periodic beach nourishment, and federal financial participation in such projects is authorized. 33 U.S.C. § 426e(a), (b). Federal funds for these projects are limited to plans that "have been specifically adopted and authorized by Congress" or, "in the case of a small project under section 426g," to plans that have "been approved by the Chief of Engineers." *Id.* § 426e(e)(1). The Defendants argue that the Plaintiffs have not identified any shore protection project specifically authorized by Congress or any action by the Defendants that fall within the ambit of the statute. In response, the Plaintiffs generally reference a consent decree regarding sand replenishment in 2000 within the Park on the Portage Lakefront Beach. *See* Am. Compl. ¶ 44. The Plaintiffs cite no legal authority for invoking § 426e to enforce a consent decree. Nor have the Plaintiffs identified any discrete action the Defendants are required to take related to "shore protection" under the statute, which is necessary to compel action under the APA. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004); *see infra* Part II.A.1. Accordingly, the Court grants the motion to dismiss Count I.F as to the claim under 33 U.S.C. § 426e.

20

2.      *16 U.S.C. § 1451*

The Amended Complaint alleges that, by failing to issue the permits as requested, the Defendants failed to comply with the Coastal Zone Management Act (CZMA), 16 U.S.C. § 1451, which "mandates compliance with the Lake Michigan Coastal Management Plan and Final Environmental Impact Statement ("LMCP")." Am. Compl. ¶ 23. The Amended Complaint further alleges that the LMCP

> provides that Ogden Dunes is an area where erosion rates have been increased by man-made structures and as such, is exempt from the 'let nature take its course' philosophy and further *that owners* of residential, commercial, or industrial properties that suffer erosion damage due to storm events or changes in lake level *can obtain a permit* under the *Navigable Waters Act* to restore their properties along or below the ordinary high water mark.

*Id*. (emphasis added).

The Defendants argue that the CZMA provides no basis for the Plaintiffs to obtain relief because, even accepting the Plaintiffs' allegations as true, the Navigable Waters Act is an Indiana state statute, *see* Ind. Code § 14-29-1, and, thus, has no bearing on whether the Town can obtain a permit under the CWA or any other federal statute. The Plaintiffs recognize that the CZMA does not create a private right of action but argue that they are pursuing an action under the APA to force the Defendants' compliance with their obligations under the CZMA in issuing the requested permit. *See New York v. DeLyser*, 759 F. Supp. 982, 987 (W.D.N.Y. 1991) (commenting that "case law suggests that an injured party may bring an action to force the federal government to fulfill its statutory obligations under CZMA" through the APA (citing cases)); *see also George v. New York City Dep't of City Planning*, 436 F.3d 102, 104 (2d Cir. 2006) (citing *DeLyser*, 759 F. Supp. at 987)). However, the Plaintiffs have not identified any discrete action the Defendants are required to take under the CZMA in relation to the Town's permit application. *See Norton*, 542 U.S. at 64; *see infra* Part II.A.1. Accordingly, the Plaintiffs

21

have failed to state a claim under the CZMA, and the Court grants the motion to dismiss Count

I.F based on the CZMA.

3.      *16 U.S.C. § 460u-11*

Finally, 16 U.S.C. § 460u-11, which was added in conjunction with the 1976 expansion

of the Park's boundaries, provides:

> The authorization of lands to be added to the Park by the Ninety-fourth Congress
> and the administration of such lands as part of the Park shall in and of itself in no
> way operate to render more restrictive the application of Federal, State, or local air
> and water pollution standards to the uses of property *outside the boundaries of the
> Park . . . .*

16 U.S.C. § 460u-11(b) (emphasis added). The Plaintiffs allege that the Defendants are in

violation of the statute because the location of the proposed area of work is not within the Park's

boundaries. *See* Am. Compl. ¶¶ 24, 36, 40, 41; *see supra* Part I.A.2. First, the Defendants seek

dismissal on the basis that the Plaintiffs have failed to identify the requisite final agency action.

*See Lujan*, 497 U.S. at 882. However, as set forth below in Part II.B.2, the Plaintiffs have alleged

a final agency action in the NPS' July 18, 2019 denial of the Town's application for a Special

Use Permit. *See* Am. Compl. ¶ 56; Defs.' Ex. 2. Second, the Defendants argue that this is an

attempt to challenge the NPS' regulatory authority and that the statute is inapplicable because the

regulated area is *within* the Park's boundaries. As discussed above in Part I.B.2, the Plaintiffs

have stated a claim challenging the NPS' regulatory authority based on allegations that the area

is not within the boundaries of the Park. Accordingly, the Court denies the motion to dismiss

Count I.F as to 16 U.S.C. § 460u-11.

## II.      Administrative Procedures Act

Should the Corps and/or the NPS have authority over the Plaintiffs' proposed work on the

shore protection system, the Plaintiffs ask for a declaration that the Corps and the NPS have

failed to comply with the APA by:

> (i)      [] failing to grant or deny the issuance of a permit to Plaintiff, Ogden Dunes.
> (ii)     Imposing obligations beyond their statutory authority.
> (iii)    Unreasonably extending the process for the issuance of a permit.
> (iv)     Imposing indefinite, arbitrary, and capricious obligations upon Plaintiff, Ogden Dunes, prior to the issuance of a permit.
> (v)      Granting conditional relief, but then requiring complete remediation of that relief, all of which is beyond their statutory authority.

Am. Compl. ¶ 69.B (Count I.B). Similarly, Count II alleges that the Corps and the NPS are in

violation of the APA (1) by acting contrary to their legal obligations under the United States

Code, the Code of Federal Regulations, and the Director's Orders of the NPS; (2) by unlawfully

withholding and unreasonably delaying agency action; (3) by acting in excess of their statutory

authority and limitations; and (4) by acting contrary to the rights of the Plaintiffs under the Fifth

Amendment to the United States Constitution. *Id.* at ¶¶ 70–73.

The APA provides that a suit may be brought by "[a] person suffering legal wrong

because of agency action, or adversely affected or aggrieved by agency action within the

meaning of a relevant statute." 5 U.S.C. § 702. Thus, "[t]he APA generally waives the Federal

Government's immunity from a suit 'seeking relief other than money damages and stating a

claim that an agency or an officer or employee thereof acted or failed to act in an official

capacity or under color of legal authority.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi

Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702). "Where no other statute

provides a private right of action, the 'agency action' complained of must be '*final* agency

action.'" *Norton*, 542 U.S. at 61–62 (quoting 5 U.S.C. § 704). The APA defines "agency action"

23

to "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or *failure to act*." 5 U.S.C. § 551(13) (emphasis added); *see id.* § 701(b)(2) (referencing 5 U.S.C. § 551 for the definition of "agency action"); *Norton*, 542 U.S. at 62. The Court considers the Plaintiffs' APA claims first against the Corps and then the NPS.

**A.    The Corps**

*1.    Unreasonable Delay—5 U.S.C. § 706(1)*

The Plaintiffs allege that the Corps has unreasonably delayed and failed to make a decision on the Town's CWA permit application. Am. Compl. ¶¶ 48–57, 69.B(iii), 71. Under § 706(1), a court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Because an "agency action" includes the "failure to act," section 706(1) provides relief for a "failure to act." *Norton*, 542 U.S. at 61–62 (citing 5 U.S.C. §§ 551(13), 706(1)). In *Norton*, the Supreme Court found that a "failure to act" is a "failure to take an *agency action*—that is, a failure to take one of the agency actions (including their equivalents) . . . defined in § 551(13)." *Id*. at 62. Those agency actions include a "license," which includes an agency permit, and "relief," which includes the agency grant of a license as well as the "taking of other action on the application or petition of, and beneficial to, a person." *Id.* (quoting 5 U.S.C. § 551(8), (11)). Nevertheless, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*"—a requirement that applies equally to an agency action unreasonably delayed. *Id.* at 63, 63 n.1, 64.

In *Norton*, the Supreme Court found persuasive the reasoning in the Attorney General's Manual on the APA that "§ 706(1) empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act.'" *Id.* at 63–64 (quoting Attorney General's Manual on the Administrative Procedure

Act 108 (1947)). "Thus, when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be." *Id.* at 65. Required agency action includes that which is required by agency regulations that have the force of law. *Id.*

First, the Defendants argue that the Corps cannot be compelled to act because the issuance of a permit under § 1344 is not an action the Corps is required to take, citing the permissive statutory language that "[t]he Secretary may issue permits." 33 U.S.C. § 1344(a). However, the Defendants incorrectly characterize the Plaintiffs' claim as asking the Court to compel the Corps to "issue a permit." Rather, the Plaintiffs are asking the Court to order the Corps to make a decision on the Town's permit application—one way or the other—after what the Plaintiffs allege has been an unreasonable delay. In other words, the Plaintiffs are asking that the Court order the Corps to "take action upon a matter, without directing *how* it shall act." *Norton*, 542 U.S. at 64. Such a decision on the Town's permit application is a discrete agency action, satisfying *Norton*'s first requirement.

*Norton*'s second requirement asks whether a decision on the permit application in a certain timeframe is an action the Corps is required to take. A review of the applicable regulations answers the question in the affirmative. The regulations set forth the policies and procedures the Corps must follow in processing applications for § 404 permits. *See* 33 C.F.R. §§ 320, 323. The regulations then set out the steps the Corps must take to process an application, *see* 33 C.F.R. § 325.2(a) ("Standard procedures"), and provides specific "time limits for the indicated steps in the evaluation process," *see id.* § 325.2(d) ("Timing of processing of applications"). "After all [the actions in § 325.2(a)(1)–(5)] have been completed, the district engineer will determine in accordance with the record and appliable regulations whether or not

25

the permit should be issued." *Id.* § 325.2(a)(6). Thus, the Corps has a duty to process a completed permit application.

The Plaintiffs have alleged a discrete agency action that the Corps is required to take, namely a decision on the Plaintiffs' permit application, which is subject to review under § 706(1). *Cf. Castle v. Pac. Legal Found.*, 445 U.S. 198, 220 n.14 (1980) ("We note, as well, that Los Angeles, under the [APA], 5 U.S.C. § 706(1) . . . may obtain judicial review of prolonged agency inaction with respect to its application for a new [NPDES] permit."); *Huron Mountain Club v. U.S. Army Corps of Eng'rs*, 545 F. App'x 390, 394 (6th Cir. 2013) ("It is clear from the text of the CWA that Congress did not contemplate placing the burden on the agency to initiate the permit process, but rather to process permit applications once filed.");[10] *Safeway Stores, Inc. v. Brown*, 138 F.2d 278, 280 (Emer. Ct. App. 1943) ("Under such circumstances mandamus will lie where an inferior tribunal or agency refuses to act even though the act required involves the exercise of judgment and discretion."), *cited in Norton*, 542 U.S. at 66. Whether the permit application is granted or denied remains within the discretion of the Corps. *See Rapanos*, 547 U.S. at 721.

---

[10] The Defendants cite *Huron Mountain Club* in support of their argument that the Court cannot compel the Corps to issue a permit. But again, the Plaintiffs are not seeking to compel the issuance of a permit but rather to compel a decision on the Town's application. Moreover, the factual and legal issues raised in *Huron Mountain Club* are distinguishable. In that case, the plaintiff asked the court to compel the Corps to take action to require a mining company to submit a permit *application* under § 404 of the CWA when no federal permit application had been filed. 545 F. App'x at 392. The plaintiff argued that the Corps had a non-discretionary duty to "to administer the CWA permitting program by seeking out potential violators and forcing them to submit an application" for a permit. *Id.* at 394. Rejecting the argument and affirming the district court's denial of a preliminary injunction, the Sixth Circuit held that the plaintiff had not shown that the RHA or the CWA "dictate any 'discrete action' the Corps is 'required' to take with regard to parties *who have not submitted* RHA and CWA permit applications and in the absence of a requisite for a jurisdictional determination." *Id*. at 393 (quoting *Norton*, 542 U.S. at 63) (emphasis added). Thus, *Huron Mountain Club* does not address the question of whether the Corps is required to take action when a permit application has been filed. Nevertheless, the court explained: "It is clear from the text of the CWA that Congress did not contemplate placing the burden on the agency to initiate the permit process, *but rather to process permit applications once filed*." *Id.* at 394 (emphasis added).

Second, the Defendants argue that the Plaintiffs have failed to allege facts to plausibly show that the Corps "unreasonably delayed" issuing a decision. The Court disagrees. As set forth in the Background above, the Plaintiffs have alleged the lengthy chronology of the Town's attempt to obtain a permit beginning in 2009, including the Corps' insistence on an NPS permit, despite the Plaintiffs obtaining permits both initially and following 2014 applications from the IDNR and IDEM. The Plaintiffs allege that the Corps declined to issue a permit in 2016 based on the NPS' objection and that after the Town's subsequent attempt to obtain an NPS permit, which the NPS again did not grant in July 2016, the Corps continues to insist on an NPS permit, leaving the application pending before the Corps. However, as even the Defendants note, the applicable regulations provide that the "[p]rocessing of an application for a . . . permit normally will proceed concurrently with the processing of other required Federal . . . authorizations or certifications" and that

> where the required Federal . . . authorization and/or certification has been denied for activities which also require a Department of the Army permit before final action has been taken on the Army permit application, the district engineer will, after considering the likelihood of subsequent approval of the other authorization and/or certification and the time and effort remaining to complete processing the Army permit application, *either* immediately *deny* the Army permit without prejudice *or continue processing* the application to a conclusion. *If* the district engineer continues processing the application, he will conclude by *either denying* the permit as contrary to the public interest, or *denying it without prejudice* indicating that except for the other Federal . . . denial the Army permit could, under appropriate conditions, be issued.

33 C.F.R. § 320.4(j)(1) (emphasis added). Here, the NPS denied the Town's request for a Special Use Permit, yet the Corps has neither denied nor denied without prejudice the Town's CWA permit application. The Plaintiffs argue that the Defendants have failed to comply with the regulations. The Court finds that the Plaintiffs have alleged sufficient facts to state a claim under § 706(1).

Finally, the Defendants argue that the Corps did not unreasonably delay processing the Town's permit application because any delay is due to the Town's failure to complete its application. The Defendants cite the Corps' September 26, 2019 letter listing six items the Town needed to complete its permit application.[11] The Court finds that this is a disputed factual issue that is not properly resolved on the instant motion to dismiss. Although the Amended Complaint references the September 26, 2019 letter for the fact that the Corps "has refused to approve the proposed work unless and until the NPS signs off," Am. Compl. ¶ 57, it is the Defendants who attached the letter as evidence that the Town has not completed its application. The Plaintiffs ask to be allowed to rebut the Corps' assertion of the incompleteness of the Town's application with affidavits and evidence. Although the Court can consider the letter submitted by the Defendants because it is referenced in the Amended Complaint, the Plaintiffs should be given an opportunity to respond with evidence regarding whether the Town had completed its application.

For all of these reasons, the Court denies the motion to dismiss the § 706(1) claim against the Corps.

### 2.     *Arbitrary and Capricious Action—5 U.S.C. § 706(2)*

In Counts I.B and II, the Plaintiffs allege that the Corps has imposed "indefinite, arbitrary, and capricious obligations upon Plaintiff, Ogden Dunes, prior to the issuance of a permit," Am. Compl. ¶ 69.B(iv); acted contrary to its legal obligations under the United States Code and the Code of Federal Regulations, *id.* at ¶ 70; and acted in excess of its statutory authority and limitations, *id.* at ¶ 72. Under § 706(2), a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

---

[11] The Court recognizes that the requirements on the list include sufficiently detailed construction drawings, a description of alternative methods, and a properly signed application. *See* Defs.' Br. 13 (citing Defs.' Ex. 3).

discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). This judicial review is limited to "final agency action for which there is no other adequate remedy in a court." *Id*. § 704; *see Norton*, 542 U.S. at 61–62. The Supreme Court has established

> two conditions that generally must be satisfied for agency action to be "final" under the APA. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."

*U.S. Army Corps. of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)); *see, e.g.*, *Sackett v. EPA*, 566 U.S. 120, 126–27 (2012).

The Defendants argue that the § 706(2) claim against the Corps fails because the Plaintiffs have not identified any such final decision by the Corps and that the Plaintiffs' entire theory of the case is premised on the assumption that the Corps has *failed* to act. Thus, they argue that it is fatally inconsistent to say that the Corps has both failed to act and also acted arbitrarily with respect to a final agency action. The Plaintiffs respond that they are entitled to plead in the alternative. Although pleading in the alternative is permissible, the Plaintiffs have not pleaded any facts identifying a final agency action by the Corps. Nor have the Plaintiffs argued that the Corps' September 26, 2019 letter asking the Town to provide six items of information to complete the permit application constituted a final decision. Thus, the Court grants the motion to dismiss the Plaintiffs' § 706(2) claim against the Corps.

**B.     The NPS**

*1.     Unreasonable Delay—5 U.S.C. § 706(1)*

The Amended Complaint alleges that, on June 10, 2019, the Town submitted "yet another request to the NPS seeking approval for the placement of stone toe protection for the Town

shoreline." Am. Compl. ¶ 55. The Amended Complaint then alleges that the NPS has neither

granted nor denied the Town's application, *id.* at ¶ 56, the status of the NPS permit request is

"still open," *id.* at ¶ 57, the NPS has unreasonably extended the process for the issuance of a

permit, *id.* at ¶ 69.B(iii), and the NPS has unlawfully withheld and unreasonably delayed agency

action, *id.* at ¶ 71. However, the NPS' July 18, 2019 letter, referenced in the Amended Complaint

and attached by the Defendants, states that the NPS is "not issuing a permit for the activities

described in your most recent Special Use Permit request" and encourages the Town to reapply

for a Special Use Permit once the necessary information is gathered. Def. Ex. 2; *see* Am. Compl.

¶ 56. The Plaintiffs have offered no argument why this letter does not constitute a final agency

action. Accordingly, the Plaintiffs have failed to allege an agency action by the NPS that has

been "unlawfully withheld or unreasonably delayed" under § 706(1). As a result, the Court

grants the motion to dismiss the § 706(1) claim against the NPS.

2.      *Arbitrary and Capricious Action—5 U.S.C. § 706(2)*

        As with the Corps, the Plaintiffs allege in Counts I.B and II that the NPS has imposed

"indefinite, arbitrary, and capricious obligations upon Plaintiff, Ogden Dunes, prior to the

issuance of a permit," Am. Compl. ¶ 69.B(iv); acted contrary to its legal obligations under the

United States Code, the Code of Federal Regulations, and the Director's Orders of the NPS, *id.* at

¶ 70; and acted in excess of its statutory authority and limitations, *id.* at ¶ 72. Although the

Defendants move to dismiss the claims that the NPS exceeded its regulatory authority and the

claim under § 706(1), it does not appear that the Defendants have moved to dismiss the § 706(2)

claim against the NPS. As noted in the previous section, the NPS denied the Town's request for a

Special Use Permit on July 18, 2019, and the Plaintiffs allege that the NPS "has rendered

indeterminate conditions and stipulations beyond its jurisdiction and authority, including

requiring an EIS at Ogden Dunes' expense." *Id.* at ¶ 56. Thus, the Court denies the Defendants'

motion to the extent it seeks dismissal of the § 706(2) claim against the NPS.

**C.      The Fifth Amendment**

The Fifth Amendment provides: "No person shall . . . be deprived of life, liberty, or

property, without due process of law; nor shall private property be taken for public use, without

just compensation." U.S. Const. amend. V. The Plaintiffs bring their Fifth Amendment claim

under the APA, which provides that a court must "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or

immunity." 5 U.S.C. § 706(2)(B). The Plaintiffs allege that the Corps and the NPS "are in

violation of the APA by acting contrary to the rights of Plaintiffs under the Fifth Amendment to

the United States Constitution." Am. Compl. ¶ 73.

In their motion, the Defendants argue generally that the Plaintiffs have failed to allege

facts that the Corps or the NPS deprived them of any particular constitutionally protected

interest. The Plaintiffs respond that they are alleging Fifth Amendment claims of both a taking

for public use without just compensation and a deprivation of the right to procedural due process.

Their claims are based on the Corps' alleged failure to comply with a consent decree that

obligated it to provide beach sand nourishment on the Portage Lakefront Beach on a regular

basis, which led to the erosion of Ogden Dunes' shoreline, depriving the Town of its property

interest in its beach property. *See* Pls.' Resp. 15–16 (citing Am. Compl. ¶ 44).

First, the Plaintiffs have failed to state a claim for a due process violation because they

have not alleged or identified what procedures they were due. *Manistee Apartments, LLC v. City

of Chicago*, 844 F.3d 630, 633 (7th Cir. 2016) (a claim for a procedural due process violation

requires "(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process").

As for the takings claim, brought under the APA, the Defendants assert in the reply brief that this claim "is wholly untethered to either the permit process that is the focus of the Complaint or any other agency decision made within the six-year statute of limitations applicable to APA claims." Defs.' Reply 11 n.9. Indeed, the Plaintiffs do not argue that their constitutional claim is based on the current administrative permit process for repair of the shore protection system.[12] Rather, the Plaintiffs argue that the claim is based on the Corps' violation of a consent decree, a claim which the Defendants appear to contend is barred by the statute of limitations. "Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (quoting *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009)). Such a dismissal "is appropriate only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Id.* (citation omitted). Here, the Amended Complaint alleges that the first sand nourishment occurred in 2000, that the Corps failed to comply with the consent decree thereafter, and that by 2009, the east end of Ogden Dunes was exposed. Am. Compl. ¶ 44. Although these facts suggest that the claim may

---

[12] The Plaintiffs comment that, now that the beach has disappeared, both the Corps and the NPS are claiming "jurisdiction," if not "ownership," over the "now eviscerated shoreline." Pls.' Resp. 16. The Plaintiffs allege no facts to support a claim that either the Corps or the NPS are asserting "ownership" of the Town's property. *See infra* Part IV. The Court addresses the Plaintiffs' challenge to the Corps' and the NPS' jurisdiction over the proposed work above in Part I.A. The Plaintiffs also do not argue that there is a regulatory taking. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015) (explaining that regulatory taking is "a restriction on the use of property that went 'too far'" (quoting *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922))).

ultimately be found untimely, there are insufficient facts regarding the terms of the consent decree to rule on the statute of limitations on the instant motion.[13]

Accordingly, the Court grants the motion as to the Plaintiffs' Fifth Amendment due process claim and denies the motion as to the Fifth Amendment takings claim.

## III.    Writ of Mandamus

In Count III, the Plaintiffs seek a writ of mandamus pursuant to 28 U.S.C. § 1651 compelling the Defendants to "[i]ssue a grant or denial of the Application for Permit by Ogden Dunes, definitive in nature, without contingency, and in compliance with applicable law" and "[p]erform their statutory duties within a time certain as determined and ordered by the Court." Am. Compl. ¶ 74. This is the same relief sought under the APA under § 706(1). "District courts have the authority to issue a writ of mandamus to compel an agency to perform a duty owed to a plaintiff." *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017) (citing 28 U.S.C. § 1361). Such relief "will be granted if the plaintiff can demonstrate that the three enumerated conditions are present: (1) a clear right to the relief sought; (2) that the defendant has a duty to do the act in question; and (3) no other adequate remedy is available." *Id.* at 275 (quoting *Iddir v. INS*, 301 F.3d 492, 499 (7th Cir. 2002)). For the reasons set forth above in relation to the claims under § 706(1), the Court grants the motion to dismiss the mandamus claim as to the NPS and denies the motion to dismiss the mandamus claim as to the Corps.

## IV.    Quiet Title Act

In Count V, the "Plaintiffs seek to quiet title to that portion of the land/area delineated within the Boundary Acquisition Map which lies northerly of the Plaintiffs['] property and

---

[13] The Court notes that a claim for money damages, which substitute for a suffered loss, is jurisdictionally barred under the APA. *See Veluchamy v. FDIC*, 706 F.3d 810, 815 (7th Cir. 2013) (citing *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999)).

westerly of the easternmost boundary of Ogden Dunes." Am. Compl. ¶ 77. They allege that the

Defendants have no right, title, or interest in that land as it can only be acquired by donation or

purchase, neither of which has occurred. *Id.* at ¶ 78; *see also id.* at ¶ 58.[14] The Court grants the

Defendants' motion to dismiss because the Plaintiffs have failed to meet the pleading

requirements of the Quiet Title Act such that the claim is barred by sovereign immunity.

It is "axiomatic that the United States may not be sued without its consent and that the

existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206,

212 (1983) (citations omitted); *see FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign

immunity is jurisdictional in nature."). The party bringing suit against the United States has the

burden to prove that sovereign immunity has been waived. *Macklin v. United States*, 300 F.3d

814, 819 (7th Cir. 2002).

The Quiet Title Act of 1972 (QTA), 28 U.S.C. § 2409a, is "the exclusive means by which

adverse claimants [can] challenge the United States' title to real property." *Block v. North

Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 286 (1983); *see Patchak*, 567 U.S. at

215. "[W]hen Congress attaches conditions to legislation waiving the sovereign immunity of the

United States, those conditions must be strictly observed, and exceptions thereto are not to be

lightly implied." *Block*, 461 U.S. at 287. The QTA creates a limited waiver of sovereign

immunity "to adjudicate a disputed title to real property in which the United States claims an

interest." 28 U.S.C. § 2409a(a). A complaint brought under the QTA must "set forth with

particularity the nature of the right, title, or interest which the plaintiff claims in the real

---

[14] Count V asks the Court to determine that "neither the NPS nor any other defendant has any right, title, or interest in the area specified." Am. Compl. 18. To the extent this a separate challenge to Defendants' regulatory authority under the APA, this claim is addressed above in Part I.A. *See Patchak*, 567 U.S. at 221; Pls.' Resp. 19 ("The Town has brought a cause of action under the APA challenging the jurisdiction of the Corps and NPS challenging their authority to exercise jurisdiction up to the artificially created high-water mark.").

property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States." 28 U.S.C. § 2409a(d). A quiet title action "is universally understood to refer to suits in which a plaintiff not only challenges someone else's claim, but also asserts his own right to disputed property." *Patchak*, 567 U.S. at 217.

The Plaintiffs have failed to meet these statutory pleading requirements because they do not allege that they claim any right, title, or interest in the property referenced in ¶ 77, identified as "that portion of the land/area delineated within the Boundary Acquisition Map which lies northerly of the Plaintiffs' property." Am. Compl. ¶ 77. Thus, like in *Patchak* where the plaintiff also did not assert a right in the real property, the Plaintiffs' suit in this case is "not a quiet title action." 567 U.S. at 217–18; Pls.' Resp. 19 ("By the same token, the Town's cause of action stands on equal footing with the plaintiff in *Patchak*."). Because the Plaintiffs are not adverse claimants, their claim "lacks a defining feature of a QTA action," the QTA does not come into play, and there is no waiver of sovereign immunity. *Patchak*, 567 U.S. at 218, 220–21.[15]

Moreover, the Plaintiffs have not alleged that the United States claims any right, title, or interest in the real property referenced in ¶ 77, which is also a QTA pleading requirement. The Corps asserts regulatory authority over the Plaintiffs' proposed activity based on the CWA, and the NPS asserts regulatory authority on the basis that the area is within the boundaries of the

---

[15] The Plaintiffs' reliance on *Shawnee Trail Conservancy v. United States Department of Agriculture*, is misplaced because the plaintiff in that case was attempting to challenge federal ownership of property *without* invoking the QTA. 222 F.3d 383 (7th Cir. 2000). Instead, the plaintiff brought a constitutional claim to argue that the United States Forest Service lacked authority to regulate property that the United States allegedly did not own. *Id.* at 385–88. The Seventh Circuit held that, because the plaintiff was bringing an adverse claim of title against the United States, even though the plaintiff itself was not claiming title to the land, the claim had to be brought pursuant to the QTA and that the district court properly dismissed the constitutional challenge for lack of subject matter jurisdiction. *Id.* at 388. The Seventh Circuit rejected the plaintiff's assertion that, because the plaintiff was not seeking to quiet title in itself, the QTA did not apply. *Id.* at 387–88. Although the court did not reach the question of the QTA pleading requirements, the court noted that any party seeking to challenge a federal property interest must be "subject to the limitations placed on such challenges [by the QTA]." *Id.* at 388.

Park. Neither assertion of jurisdiction is based on a claim of right, title, or interest in the real property. In their response brief, the Plaintiffs assert that the NPS claims ownership of a small parcel of real estate north and east of 2 Shore Drive and that this real estate has "washed away," devolving the riparian rights to either a homeowner or the State of Indiana. Pls.' Resp. 5–6, 6 n.4. However, the Amended Complaint contains no allegations regarding the ownership of that parcel. Thus, the Plaintiffs have not brought an action under the QTA based on that real estate.

Accordingly, because the Plaintiffs have not alleged and do not argue that they can allege facts to trigger the waiver of sovereign immunity required by the Quiet Title Act, the Court grants the motion to dismiss Count V.

<strong>CONCLUSION</strong>

Based on the foregoing, the Court GRANTS in part and DENIES in part the Motion to Dismiss [ECF No. 45]. The Court dismisses without prejudice: (1) the APA claims under 5 U.S.C. § 706(2) against the Corps in Counts I.B and II; (2) the APA claims under 5 U.S.C. § 706(1) against the NPS in Counts I.B and II; (3) the APA claim under 5 U.S.C. § 706(2)(B) for a violation of due process rights under the Fifth Amendment to the United States Constitution in Count II; (4) Counts I.D and V under the Quiet Title Act; (5) Count I.E for a declaratory judgment that the work contemplated by the Plaintiffs is categorically excluded from an EIS or EA under NEPA; (6) Count I.F for a declaratory judgment under 33 U.S.C. § 426e; (7) Count I.F for a declaratory judgment under 16 U.S.C. § 1451; and (8) Count III for a writ of mandamus pursuant against the NPS. All other claims remain pending.

SO ORDERED on March 10, 2022.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT